No. 64.—ALFRED HAYWOOD, plaintiff in error, *vs.* THE MAYOR AND ALDERMEN OF SAVANNAH, defendants.

[1.] The General Assembly in 1809, by a Statute, prohibited the corporation of Savannah from debarring any *citizen of the State* from selling at *wholesale,* in the City Market. In 1849, an Act was passed vesting the Mayor and Aldermen with power to pass such ordinances as should appear to them necessary for the security, welfare, and convenience of the City, or for preserving the health, peace, and good government of the same, with the usual repealing clause : *Held,* that the Act of 1849 did not repeal the Act of 1809, either directly or by necessary implication.

[2.] A later Statute, which is general, does not repeal a former one that is particular.

[3.] Where there is a difference in the whole purview of two Statutes, apparently relating to the same matter, the former remains of force.

[4.] A by-law which infringes a particular Statute, relating to a corporation, (provided the particular Statute does not impair the obligation of the charter) is void.

[5.] The General Assembly cannot confer upon a corporation the power, by ordinance, to repeal a Statute of the State. A by-law of a corporation, repugnant to the Constitution, Common or Statute Law of the State, is void.

*Certiorari*, from Chatham Superior Court.    Decided by Judge H. R. Jackson.    28th December, 1852.

Alfred Haywood was fined the sum of thirty dollars with costs, by the City Counsel of Savannah, for the violation of an ordinance prohibiting the purchase of a larger quantity of fish in the market, than was necessary for the use and consumption of his family.    A *certiorari* was applied for to the Judge of the Superior Court, whose refusal to grant the writ is assigned as error.

Lloyd and Owens, for plaintiff in error.

Charlton, Ward and Owens, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

[1.] The facts in this case, are briefly these : The plaintiff in error, Alfred Haywood, was brought up before the Mayor and Aldermen of Savannah, and fined $30, for buying in the market house, *fish* in quantity greater than was requisite for the use and consumption of his family, contrary to the Ordinance of the City, passed 30th of January, 1851.    On *certiorari* to the Superior Court, the Judge affirmed the judgment, and this writ of error is brought to reverse this decision.    And the only question is, had the municipal authorities the power to pass the ordinance, for the violation of which this fine was imposed?

The Legislature in 1809, passed an Act to limit the jurisdiction of the City of Savannah, so far as relates to the regulation of the market.    The preamble recites, that "Whereas, the citizens of *this State*, who take their produce to market, consider

themselves imposed upon, by being detained in market under an ordinance passed by the incorporated body aforesaid; for remedy whereof,

" *Be it enacted, &c.* That from and immediately after the passing of this Act, no person or persons attending said market with any commodity for sale, shall be detained in said market, or debarred from selling by the wholesale or retail after the rising of the sun; any law, ordinance or usage, to the contrary, notwithstanding." *Clayton's Dig.* 540.

The old market having been entirely consumed by the great fire of 1820, the General Assembly in 1821, authorized the erection of a new market, on the same spot of ground which had been occupied by the old one, to wit, Ellis's Square, which had been set apart for that purpose as far back as the 7th of April, 1763. The new market was to be built at the expense of the City, and vested absolutely in the corporation. *Dawson's Compilation,* 427.

In 1825, an Act was passed by the Legislature, to amend and consolidate the several Acts which had been previously passed in relation to the powers and privileges of the corporation of the City of Savannah and the hamlets thereof, and for other purposes therein mentioned. By the 11th section of this Act, the Mayor and Aldermen, or a majority of them, are clothed with power and authority, " to make such by-laws and regulations, and impose such pains, penalties, and forfeitures for the violation of the' same, as shall be conducive to the good order and government of the City." *Dawson's Compilation,* 464, 465.

It having been held by the Courts, that notwithstanding this broad grant of power to legislate generally, for the good order, &c. of the City, that the corporation had no authority to tax *income,* although in addition to this general grant, by the 7th section of the same Act, the Mayor and Aldermen were empowered " to raise any sum or sums of money by a poll tax, or by tax and assessment upon all *real and personal estate,* within the corporate limits of the City," the Legislature in December, 1849, passed another Act amendatory of and in addition to the various Acts heretofore passed, in reference to the City of Savan-

nah.   And by the 3rd section of this Act, it is provided, " That the Mayor and Aldermen of the City of Savannah, and the hamlets thereof, be and they are hereby vested with full power and authority, from time to time, to make, ordain, and establish such by-laws, rules, regulations and ordinances, as shall appear to them necessary, for the security, welfare, and convenience, of the said City, or for preserving health, peace, and good government within the present or future bounds of the same." *Pamphlet Acts*, 1849, *pp.* 83, 84, 85.

The remainder of the third section, is to confer additional authority relative to taxation.

The 4th is in reference to the same subject.

The 5th gives to the corporation the power to lay out new streets and lanes, and to widen the old ones.

The 6th provides the mode of assessing damages, under the exercise of power in the 5th section.

The 7th relates to side-walks and pavements.

The 8th exempts the Mayor and Aldermen from the performance of Jury duty during their continuance in office.

The 9th enacts that where doubts shall arise, as to the construction of the Act, or any previous Act passed, touching the City of Savannah, the same shall in Courts of Law and Equity and elsewhere, be taken most favorably for the corporation.

And the 10th declares that all laws and parts of laws, militating against this Act, be, and the same are hereby repealed. *Ib.*

Do any or all of these Acts, repeal directly or by necessary implication, the Act of 1809 ?   That Act, it will be recollected, confers upon *the citizens of the State*, the right to sell at *wholesale*, in the City market; and his Honor, Judge *Jackson*, held, and we think very properly, that if the vendor may *sell* at *wholesale*, that the purchaser cannot be restricted in the quantity he shall *buy*.   But in the judgment of the Circuit Court, the Act of 1809 has been repealed by the subsequent legislation, which has been cited, or by the ordinance of 1851, passed in pursuance thereof.

We do not apprehend that the Act of 1820, granting to the citizens of Savannah, the right of erecting at their own expense

and cost, a public market, to be absolutely vested in the corporation, has much to do with this controversy. And although referred to, both in the argument and the decision, little or no reliance seems to have been placed upon it in either.

But why so little stress is laid upon the Act of 1825, in the discussion, and why it should be wholly pretermitted in the opinion under review, we cannot readily comprehend. It will be seen, by referring to it, that the grant of power under the 11th section of that Act, is almost as broad and sweeping as that conveyed by the 3rd section of the Act of 1849. And the former as well as the latter, contained at the conclusion, the usual repealing clause of all Acts or parts of Acts, militating against its provisions. It is true, that the Act of 1825, inhibits the corporation from passing any ordinance contravening the laws of the State or the Constitution thereof; and that this interdiction is omitted in the Act of 1849. But in the absence of such prohibition, it is not pretended that a municipal corporation could, by its by-laws, contravene the Constitution, Common Law, or Statutes of the State.

But the Act of 1849, is supposed to settle this question, and to justify the ordinance of 1851, under which this fine was inflicted. In other words, that it repeals the restriction in the Act of 1809. And the reason assigned for this conclusion, is this : The Act of 1849, it is said, is entitled an Act amendatory of and in addition to the various Acts heretofore passed, in reference to the City of Savannah. Now, it is asked, was the Act of 1809, an Act passed in reference to the City of Savannah? If so, says the Circuit Judge, it is embraced in the caption of the Act of 1849, and repealed by it. Again, it is asked, does it militate against the Act of 1849? The answer is, that it does, inasmuch as it restricts the Mayor and Aldermen so far as it relates to the passage of ordinances regulating the market; whereas, the Act of 1849, gives to the Mayor and Aldermen unlimited jurisdiction over this subject. The deduction is that the Act of 1809, is repealed by the Act of 1849, and if not, it is repealed by the ordinance of 1851 ; the Legislature by that Act

having clothed the Mayor and Aldermen with legislative power for that purpose.

We are not prepared to concede, that the Act of 1809 was passed in reference to the City of Savannah, in the sense in which that phrase is used in the Act of 1849. It is true, it was an Act passed to limit the jurisdiction of the Aldermen of the City of Savannah, so far as it relates to the regulation of the market. Still the scope of the Act takes a wider range, and was designed to protect *the citizens of the State*, from the grievance therein complained of. But yielding this point, we are well satisfied that there is no repugnance between the Acts of 1809 and 1849 ; and that no collision was supposed to exist by the law-making power. The object of the former was to *limit* the jurisdiction of the City corporation, in respect to a particular matter in which the people of the State had a special interest; whereas, the design of the Act of 1849, was to grant new and additional powers in matters not contemplated by the Act of 1809.

[2.] It is a well established rule of construction, that a later Statute, which is general, does not repeal a former one that is particular.

[3.] And that where there is a difference in the whole purview of two Statutes, apparently relating to the same matter, the former remains of force. 674 *Dwarris on Statutes,* 717. 4 *Rex vs. Downs,* 3 *S. R.* 563, 567, 569, 570, 571, 572. *Grassit vs. Ogletree,* 6 *Brown's Par. Cas.* 75. Courts do not favor the constructive repeal of Statutes. *Dwarris,* 674.

[4.] Again, by-laws, which infringe the Common or Statute Law of the State, or particular Statutes relating to the corporation, (provided these particular Statutes do not impair the obligation of the charter,) are void. *Ang. and Am. on Corporations,* 331.

If the general grant of power in the 11th section of the Act of 1825, coupled with the special authority delegated by the 7th section of that Act, " to tax *real and personal estate*," did not authorize this corporation to tax *income,* and such was the opin-

ion of this Court, in the case of the Mayor and Aldermen of Savannah, against Charles Hartridge, (8 *Geo. Rep.* 23,) much less does the grant in the Act of 1849, confer upon the City the right to repeal by its ordinance, the restriction in the Act of. 1809. The general course of reasoning adopted by the Court in that case, as well as the authorities there cited, are applicable to this. Indeed, it might be insisted, with great propriety, that the "general welfare" clause in this Act is limited to the specific powers subsequently enumerated in the latter part of the third, and the remaining sections of the Act. The inclusion of the particular powers is the exclusion of all others, except such as are inherent in the charter itself, in reference to the object for which it was created.

[5.] If, then, the Act of 1809 is not repealed, either directly or by implication, by the Act of 1849, surely it will not be seriously contended that such a construction should be put upon the general powers granted to this corporation under the latter Act, as would enable them to repeal, by an ordinance, a law of the State. We deny the right of the Legislature to confer such a power upon a *subordinate* authority.

And may I, without giving offence, not in the spirit of dictation or censoriousness, but of the utmost kindness and respect, for the commercial emporium of my native State, and its constituted authorities, say, that we are glad in this instance, to have it in our power to serve the *interest* of the City against its *inclination*, if indeed this restriction upon trade meets with the public favor. For the effect of this decision, we have no doubt, will be greatly to increase the demand, and consequently the supply of the commodity in question, in the market. Better by far, instead of restricting this traffic, offer, as did a neighboring City, a few years ago, a *bonus*, to every man who would give satisfactory evidence that he employed a seine or a certain number of nets and hands in taking fish, oysters, &c. for that market. The result of which enlightened policy is, that Charleston is now one of the best fish markets on the whole Southern coast.

When we examine the situation of Savannah, the peculiar advantages which she enjoys, both for foreign and domestic

commerce; the rich and boundless back country, which is so rapidly becoming tributary to its rising greatness, by means of the rivers and railroads which converge to, or terminate in this City; the immense amount of produce which must have its exit through this seaport; its healthy location; its soft and genial climate; its facility of approach by vessels of the largest size; its safe and commodious harbor, who can doubt the proud pre-eminence to which she is destined to attain? Soon a large portion of the trade of North and South Alabama, North Mississippi, East Tennessee, and a part of West Tennessee, Florida on the South, and the great cotton, as well as grain regions proper of Georgia, must be concentrated at this highly favored market. Adverse interests, however powerful, cannot long retard this result. Nothing but the most reprehensible supineness, or illiberality on her own part, can. Instead of restrictions on trade, let her citizens continue to put forth all needful exertion—strain every nerve—as of late they have been doing—to profit by their position. Let her merchants and men of business, use the most liberal policy in their intercourse with the interior; cordially reciprocating the benefits they receive; and the most ardent hopes of the fondest friends of Savannah, will ere long, be realized. The seeming extravagant prediction may yet be realized, that she is destined to become the New York of the South.

Away then, and forever, with all these vexatious regulations. Better never eat any more fish while the world stands, than to provoke a war of countervailing restrictions in every Town and Village in the middle and upper country. If they send to the sea-board, their fruit, poultry, &c. the production of their farms, orchards, and gardens, and allow the portage on the railroads to be discontinued, to facilitate their transportation, they have a right to participate in the luxuries of the sea-board in return. With all, it is in vain to attempt to prevent this reciprocity.

The chasm in the mountain at Tallulah, and in the Blue-ridge at Harper's Ferry, are not more demonstrative of the natural law, that water runs and *will run*, than are the evidences all around, that Free Trade is destined to become the predominant principle—the permanent and paramount policy of the

world.   And I rejoice that it is so.   It is the forerunner, as well as the fruit,  of  the rapidly advancing civilization  of  the nineteenth century.   It is the adjunct and handmaiden of Christianity.   May these " golden  girdles" soon  encircle  the globe! Free Trade  and  the Bible, walking  hand-in-hand together, will finally work out the problem of  man's  moral regeneration, and establish  the reign  of Peace on  earth.   For, talk  as we  may, about man's disinterested love  of his  brother, there  is nothing after all, like self-interest, to bind together in indissoluble bonds, the factious family of Adam.

Let there not then,  be one law at Savannah,  and another  at Macon.   " *Alia lex  Romæ, alia Athenis.*"   Let commerce be as " unfettered as the winds and waves that waft it."   Let Towns, Cities, States,  and Nations, relinquishing  all  local jealousies, enter upon the strife of life, and struggle manfully for the ascendancy, upon the broad, cosmopolitan ground of " free religion ; free government; free press ; free traffic; freedom every where, and in every thing righteous throughout the world ;" and let the race and the battle be to the swift and the strong!